ARNOLD et al. v. CHESEBROUGH et al.

(Circuit Court of Appeals, Second Circuit. October 17, 1893.)

No. 77.

1. COMMON-LAW MARRIAGE—EVIDENCE.

In a suit by a daughter to compel certain executors to account for that portion of the estate devised and bequeathed to her deceased father, where the issue involved was the legitimacy of such daughter, the mother testified to a ceremonial marriage, which she afterwards denied, upon being called as a witness by the defendants, and also to an agreement by the father that there should be a marriage upon the death of his mother. It further appeared, inter alia, that the cohabitation was illicit in its origin; that the reputation of marriage was divided, although the parties registered as husband and wife, in their true names, at respectable hotels in the city where they resided, and elsewhere; that at various times and under different circumstances they held themselves out as husband and wife; that he never introduced the mother as his wife to the members of his family or any of his relatives; that on some occasions he represented her as his mistress, and on one occasion she was turned out of an hotel at which she was stopping with him as his wife, upon the admission of both that she was only his mistress; that soon after the birth of the daughter the mother deserted the father, and became the mistress of another man; that thereafter the maternal grandmother recovered and collected a judgment against the father for the seduction of the mother; the father never undertook to support his daughter, or treated her in any way as having a legal claim upon him; that he always executed conveyances of real estate as if unmarried; that he left a draft of a will which did not mention the mother or daughter; that, although he was a man of large means, neither the mother nor any of the relatives of the daughter made any claim against him as the legitimate father of the child during his life, nor against his estate until 14 years after his death. *Held,* that there was hardly an established fact in the record which was inconsistent with the theory that the parties held themselves out as husband and wife merely from motives of expediency, while the presumption from facts well proved, and the considerations arising from demonstrative conduct, denoted that the marital relation did not exist. Wheeler, District Judge, dissenting.

2. SAME.

To hold that acting as husband with a woman means what it purports, as assuming other capacities does, and legitimatize issue, seems more

v.58F.no.6—53

wholesome than to interpret it away by comparison with false pretenses of others in similar circumstances, and bastardize issue. Per Wheeler, District Judge, dissenting.

3. SAME.

A contract, in case of cohabitation, per verba de futuro, is a valid contract of marriage. 1 Bl. Comm. 465; 1 Kent, Comm. 87; 2 Greenl. Ev. § 460; Jewell v. Jewell, 1 How. 219. Per Wheeler, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of New York.

In Equity. Bill by Leonora A. Arnold and Thomas E. Arnold, her husband, against Charles A. Chesebrough individually, and as trustee and executor under the last will and testament of Margaret Chesebrough, deceased, and Elizabeth Lounsbury, executrix under the last will and testament of Stephen R. Lounsbury, deceased, (the said Stephen R. Lounsbury having also been an executor and trustee under the will of Margaret Chesebrough,) to compel defendants to account to complainants for the portion of the estate of the said Margaret Chesebrough bequeathed and devised to Blasius M. Chesebrough, son of Margaret Chesebrough, and the father of complainant Leonora A. Arnold, and to his lawful issue. The circuit court dismissed the bill. 46 Fed. Rep. 700. Complainants appeal. Affirmed.

For previous decisions in the course of the litigation, see 30 Fed. Rep. 145; 33 Fed. Rep. 571; 35 Fed. Rep. 16; 41 Fed. Rep. 74.

J. H. V. Arnold, for appellants.

Walter S. Logan, for respondents.

Before WALLACE and SHIPMAN, Circuit Judges, and WHEELER, District Judge.

WALLACE, Circuit Judge. The dismissal of the bill of complaint by the decree of the circuit court proceeded upon the ground that Leonora A. Arnold, the principal complainant, was not the issue of a marriage between her mother and Blasius M. Chesebrough. The question which this appeal requires us to decide is whether Mrs. Arnold's father and mother were husband and wife. The decision depends upon the effect of direct evidence relative to a ceremonial marriage between the parents, and of indirect or presumptive evidence indicating the matrimonial relation, arising from their cohabitation and repute, conduct, and declarations. In such actions the burden of proof is upon the party who asserts the marriage; but the law presumes, from considerations of decency and public well-being, that every competent couple, who ostensibly cohabit as husband and wife, demeaning themselves towards each other as such, and were received into society, and treated by friends and relatives as being entitled to that status, have been legally married. This presumption is indulged with special cogency when the legitimacy of the offspring is the issue for judgment. A perfect marriage may be constituted by the consent of the parties to live together as husband and wife, as well as by a ceremonial marriage, and either form of marriage may be proved by any circumstances justifying the

deduction as well as by direct evidence. But, in the absence of direct proof, marriage cannot be proved by cohabitation alone, however long maintained. The evidence must support a matrimonial cohabitation, as distinguished from a meretricious one. Com. v. Stump, 53 Pa. St. 132; Rose v. Clark, 8 Paige, 574; Cunningham v. Cunningham, 2 Dow, 482. The facts that parties have publicly acknowledged each other as husband and wife; have assumed the marriage rights, duties, and obligations; have been generally reputed in the place of their residence to be husband and wife,—are relevant to prove a contract of marriage between them. Both cohabitation and reputation are necessary to establish a presumption of marriage, where there is no proof of actual marriage. A divided repute, however, is of no efficacy. It must be a general and consistent one, to be of value. We have to apply these rules of evidence to a voluminous mass of testimony, much of which is untrustworthy, eliminating from consideration much in the record which is incompetent. We cannot undertake to recapitulate the testimony, or analyze it in detail, as it would serve no useful purpose to do so.

The facts, in outline, are these: Leonora A. Arnold was born at New York city in October, 1857. Her father was Blasius M. Chesebrough, and her mother was Josephine Cregier. The father and mother met at a dancing school in New York city, where they both resided, in 1854, and on the evening of their first meeting she accompanied him to his rooms, and remained with him during the night. She was then about 16 years of age, and was living with her mother, who kept a boarding house. He was about 35 years of age, and was an ostentatious, dissolute, lewd, eccentric man; addicted to drink, capricious, and extravagant. He had studied law, but, becoming enamored of the stage, had devoted himself to theatrical enterprises. He associated generally with low companions. He had inherited some property, but derived the larger part of his income from the allowances made to him by his widowed mother, a woman of wealth, whose children seldom visited her, except to obtain money, and who led an isolated life. He had one brother, but seldom met him. Shortly after the episode mentioned, Josephine left her mother's house, and went to live with him. They lived together at various hotels and boarding houses in New York city from 1854 to 1858. Whether they lived together continuously does not satisfactorily appear, but they certainly lived together the greater part of the time. She went by the name of "Mrs. Chesebrough," and they held themselves out as husband and wife whenever it seemed expedient or desirable to do so; but she passed as his mistress among those of his associates to whose opinion of his respectability he was indifferent. They made occasional journeys, sometimes with his own equipage, to distant parts of the country. In September, 1855, while they were at the United States Hotel at Saratoga Springs, a child was born to them, died at its birth, and was buried at that place. It would seem that they selected this place, after the close of the conventional season, to have the accouchement take place there. When the birth of a second child, Leonora, was expected, they went to live with Mrs. Cregier, Josephine's mother.

Leonora was born at Mrs. Cregier's house. He was frequently intractable, and when in drink was quarrelsome and violent. Apparently, she wearied of ·his caprices and abuse. In 1858 she left him clandestinely, going first to South Carolina, and subsequently to Tennessee, and lived while in these states with one Jackson, as his wife. Leonora was left in the mean time at the house of Mrs. Cregier. Her father did not support her, and she was provided for by Mrs. Cregier until the latter's death, which took place in 1870. In 1858 Mrs. Cregier sued him for six months' board of himself and family, and obtained a judgment for $175. In 1859 Mrs. Cregier brought suit against him for the seduction of Josephine, claiming, . in substance, that the relations had been illicit while he and Josephine lived together, and that Leonora was the fruit of their unlawful cohabitation. Mrs. Cregier and one of Josephine's sisters were witnesses at the trial of that suit. Blasius did not interpose any defense, and a judgment was obtained against him for $2,500, and subsequently collected. Mrs. Chesebrough, the mother of Blasius, died in 1860, and he then succeeded to a large property. He died in 1866, having lived as a bachelor since Josephine left him, ignorant of her whereabouts. He left no will. Leonora and Mrs. Cregier attended his funeral. In 1868 Josephine returned for a time to New York. While there, she, with her mother, consulted counsel, with a view of enforcing any rights which could be claimed by them or Leonora against the estate of Blasius. Soon after her grandmother's death, Leonora made a visit of a few months to her mother, in Tennessee, and then returned to New York. Thereafter she lived part of the time with her relatives, and part of the time supported herself by her own exertions. Between the visit to her mother in 1870, and 1880, she never heard from her mother. In 1879 Leonora married Mr. Arnold, and in the fall of that year, induced by the representations of designing persons, who had been conversant with the affairs of Blasius, he began to collect evidence to set on foot the attack which culminated in the present suit. In 1880 Leonora went to Tennessee to find her mother, and secure her assistance, and found her. Shortly afterwards, Josephine came to New York. Until this time, neither of them had taken any legal proceedings founded upon any alleged rights as the wife or daughter of Blasius.

The only evidence of a ceremonial marriage which appears in the record consists in the testimony of Josephine, the alleged wife. She testified as a witness for the complainants that, after she and Blasius had lived together some time, they went to Baltimore, Md., and were married there, by a clergyman, at his house. She could not give his name or residence, and stated that no witnesses were present. She made no mention of a marriage certificate or a wedding ring. The testimony did not offer any details tending to fix the place where the alleged marriage took place, or the person performing it, or the attendant circumstances. It suffices to say of it that it was improbable and incredible. She did testify, however, that while in Baltimore they stopped at Barnum's Hotel. It is in proof that no persons of their name were guests of that hotel. There was no publication of marriage, and no license to marry; and

in the absence of a license it would have been a criminal offense, on the part of a clergyman, to perform the ceremony. At a later stage in the taking of the proofs, she testified as a witness for the defendants, and made a complete retraction of her previous testimony relative to the ceremonial marriage. She then testified that there never was a ceremonial marriage, and that, during the time they lived together, she never believed or considered herself the wife of Blasius. When asked, however, if anything had been said between them relative to a marriage, she stated that he had promised her that he would marry her when his mother should die; but she gave no details as to the time, occasion, or circumstances of such a conversation. Of course, no credit ought to be given to the testimony of a witness who has committed bald perjury. We cannot say whether she testified truthfully in her original or in her subsequent testimony. Certainly, if any of her statements can be accepted as credible, it is only those which it would be against her probable interest or inclination to make. We may believe that on the first occasion when she met Blasius she surrendered her person to him, and that she lived with him for some period of time before the alleged ceremony of marriage, and that she left him clandestinely, and lived in the south as the wife of another man until after his death. She testified to these facts originally when she was trying to appear as a semi-respectable woman, and as to them did not recant in her subsequent testimony; but her testimony is worthless as to every other material fact which she might suppose would be of benefit to either of the parties.

We must reject as unworthy of credit the direct evidence of marriage. If there was a promise to marry her at some future time, cum copula, there was no marriage according to the law of their domicile. Cheney v. Arnold, 15 N. Y. 345; Meister v. Moore, 96 U. S. 76. The indirect evidence arising from cohabitation and repute, and the acts and declarations of Josephine and Blasius, satisfies us that the relation was a meretricious, rather than a lawful, one. As the question is wholly one of fact, we shall content ourselves with a few general observations upon the proofs.

Irrespective of the admissions of Josephine, the testimony satisfies us that the cohabitation was illicit in its origin. This being so, it is presumed to have continued illicit, and all presumptions in favor of the innocence and morality of the parties are repelled. Men sometimes marry their mistresses, but such cases are the exception. After there has been an open, illicit commerce, they seldom accord to the woman who has forfeited all claims to her own self-respect, and to the countenance of her friends, the rights of a wife. The ordinary presumption against a subsequent marriage is stronger than usual, in this case, because each of the parties regarded the marriage tie with contempt. He was a frequenter of houses of ill fame. Her notions of propriety are shown by her summary abandonment of her infant child, and becoming the mistress of Jackson. The reputation of the relation was, at best, a divided one. It was convenient, and indeed, for some purposes, was necessary, that they should maintain the semblance of a matrimonial

relation. If they had not done so, they would not have been received in such hotels and boarding houses as suited his ambitious tastes. Some of their acquaintances would have ignored them. Tradesmen would have been less indulgent. Even their servants would have treated them with less civility. It would be strange if some of those with whom they came in contact had not been led to believe them to be married. None of his relatives supposed him to be married. His boon companions understood her to be his mistress. Some of her relatives and acquaintances, doubtless, believed that she was his wife. No one was so near to her, or so likely to have a better appreciation of the true nature of the cohabitation, as her own mother. 'Mrs. Cregier was a hard-headed, practical woman. What she believed is sufficiently shown by the record of the seduction suit. Convincing evidence that they were not husband and wife is found in their own conduct. Unless they had so deported themselves that it was notorious she was only his mistress, there was no reason why he should not have introduced her to his mother as his wife. Neither her education, her manners, or her social surroundings stood in the way. There was nothing except her relations with him. Old Mrs. Chesebrough would have rejoiced to know that her son had married a decent woman. As a married man, who had finally concluded to change his mode of life, he could have appealed more effectually than before to his mother's bounty. If Josephine had been his wife, why should he have made a secret of the fact, and represented her deliberately to decent persons as being only his mistress? Such a significant episode as that detailed by the manager of the Clifton House, at Niagara Falls, where they represented themselves as man and wife until they quarreled, but finally admitted what their true relation was, cannot be explained away upon any theory of his eccentricities. He was not so utterly bereft of manly impulses as to permit her, if she had been his wife, to be ejected from the hotel as a mistress, and sent to New York, while he continued to remain there as a guest. He made conveyances of real estate as a single man. He submitted without protest to the making of a judicial record which branded her as a concubine, and his child as a bastard. Her conduct in leaving him without making any claim against him for support, and in making no such claim during his life, or against his estate until 14 years after his death, proves almost irresistibly that she knew she could not establish such a claim. She knew of his death about the time it took place, must have known, as his wife, she could secure a comfortable fortune from his estate, and she had consulted astute counsel. We place but little stress upon the circumstance that he did not recognize Leonora as a legitimate child by any testamentary disposition. We are not satisfied that he knew the contents or the effect of the will which was drawn, but not executed. He always acknowledged her paternity, and evinced sometimes some interest in her, and even affection for her. He would not have been unwilling to curtail the inheritance of his brother, even in favor of an illegitimate child. Yet there is in proof no single act of his towards Leonora, after her mother left

her, to indicate that he regarded her as having any lawful claim upon him. Mrs. Cregier was a capable and energetic woman. She took the place, after Josephine disappeared, of father and mother to Leonora. She knew how to find plenty of lawyers to take up litigations upon contingent rewards. When Blasius died, and the proofs were fresh of the relation between him and Josephine, the time had come when she could have asserted Leonora's rights, if she had any, with the prospect of securing for her grandchild, and incidentally for herself, the comforts of an ample fortune. But although she and Josephine concerted together, surveyed the ground, and consulted enterprising counsel, no attack was made throughout the four years she lived after the death of Blasius. Her inaction is unaccountable, except upon the theory that she felt satisfied there was no case sufficiently strong to warrant the attempt. She speaks from the grave, an unsummoned witness, whose testimony is more persuasive than that of a score of persons, who, with fragmentary knowledge or confused recollection, speak of incidents which took place 20 years before.

It has been observed by the courts that the concomitants of those living in illicit intercourse together are often identical with those of married people. Breadalbane Case, L. R. 1 H. L. Sc. 182; Goldbeck v. Goldbeck, 18 N. J. Eq. 42; Barnum v. Barnum, 42 Md. 251. It is not surprising that, to some extent, there should have been a repute that Blasius and Josephine were married. It is not strange that Leonora—a motherless child, practically—should have gone by the name of Chesebrough. It is not strange that the infant, who died at the hotel where they had registered and lived as though married, should be buried as the child of Mr. and Mrs. Chesebrough. In our judgment, there is hardly an established fact in the record which is inconsistent with the theory that they held themselves out as husband and wife merely for motives of expediency, while the presumptions from facts well proved, and the considerations arising from most demonstrative conduct, denote that the real relation did not exist. The decree is affirmed, with costs.

WHEELER, District Judge, (dissenting.) In 1853 Blasius M. Chesebrough, afterwards known as George M., was about 35 years old, a son of a widow of large means, and had some property of his own, and was a brother of the defendant Charles A. Chesebrough. Josephine Cregier was about 16 years old, and the daughter of a widow. Both were born, and all lived, in the city of New York. They met at a dancing school in Bond street, in a building where he had rooms, and she stayed with him in his rooms that night, and lived with him some afterwards before any pretense of marriage. On the 18th of August, 1854, they registered as husband and wife, with servant, at the Everett House, and lived there as such, excepting an absence of a few days, until October 6th. They lived together at other hotels and boarding houses, in the same way, afterwards, and had a carriage and driver, and drove about the country somewhat. About September 20, 1855, they drove to Saratoga, and registered at a hotel there as husband and wife. A child was pre-

maturely born to them there, which lived but a few days, and was buried in a lot in the cemetery there, which he procured. They continued to live together some part of the time at hotels and boarding houses in the same manner, and were to some extent spoken of as husband and wife among acquaintances. In the summer of 1857, she went to her mother's, and on October 9th the plaintiff was born there, and was their child. Dr. Groves attended her in her confinement, and made return of the birth, as required by law, to the registry, with the name of the father as "George Chesebrough," and of the mother as "Josephine Chesebrough." Her mother, on April 6, 1858, commenced a suit against him for board of himself and family for the six months previous, and, on appearance by him, recovered judgment for $175. At times, when drunk, he was very violent, and treated her with great abuse. At some time in 1858 she suddenly left him and her child, and went, without his knowledge, to Charleston, S. C., and lived with another man there. Dr. Groves commenced suit in December, 1858, against him, for attendance upon her when the plaintiff was born, and recovered judgment therein upon default. On February 4, 1859, her mother commenced suit against him for loss of services by her seduction resulting in the birth of the plaintiff, and, on default and inquest of damages, recovered judgment therein for $2,500. He tried to find her, but died in 1866 without having heard from her. This suit is brought in behalf of the plaintiff Leonora Augusta as his heir. Her mother was present at the examination of witnesses in behalf of the plaintiffs, and testified that in driving about they drove to Baltimore, and were married there in 1854, before going to the Everett House to board. Afterwards, she testified in behalf of the defendant that this was false, that they were never married, and never understood that they were, but that they agreed to be married when his mother should die. The circuit court found and held that there was no marriage, and dismissed the bill. The assignment of errors upon this appeal relates principally to this ruling.

There is no presumption of legitimacy arising from parentage. Blackburn v. Crawfords, 3 Wall. 186. But cohabitation as husband and wife is presumed to be lawful, and legitimacy may be found from it, although, if it was illicit in the beginning the presumption is rebutted until a marriage is shown which would change its character. 2 Greenl. Ev. 462; Jewell v. Jewell, 1 How. 219; Gaines v. New Orleans, 6 Wall. 642. The mother's testimony that there was a marriage remains in the case, although retracted, and is strongly corroborated by their holding themselves out as husband and wife, and living together openly as such at respectable hotels and boarding houses, and particularly by their recognition of each other as married parents at the time of the death and burial of their first child. She could destroy the force of her testimony, so far as it rested upon her truthfulness, but could not take away from it the support of this corroboration. Her first testimony was consistent with their acts and conduct, but the last was not. The theory of a marriage is further supported by the registry of the birth, for the mother would not become Josephine Chesebrough but

by marriage; and it is further strongly supported by the judgments against him for her board as a part of his family, and for the physician's services at the birth of the plaintiff, for he would be liable for neither if she was not his wife. This theory is also somewhat supported by the reputation of a marriage among their relatives, friends, and acquaintances, but this is met by proof of reputation to the contrary. The proof of reputation could be done away with by counter proof of the same sort; but proof of a marriage in fact by direct evidence, or by acts and conduct of the parties, could not be disproved by evidence of reputation to the contrary. 1 Greenl. Ev. § 107. Mr. Justice Davis, in Gaines v. New Orleans, 6 Wall. 706, said:

"Concede it is true that Clark behaved so as to cause his most intimate friends to disbelieve the fact of marriage; that he held himself out to the world as a single man, and by public repute, after the time of the alleged marriage, lived with Zulime, ostensibly, not as his wife. Still, the case of the complainant is not weakened."

There, as here, the cohabitation began meretriciously, and ended in desertion of the father by the mother, and unlawful cohabitation by her with another man. As marriage is, in law, but a civil contract between the parties, resting upon their consent, although most often celebrated by religious ceremony, the open and public registration of their true names, as they would be if married, in noted and respectable hotels of the city and in the neighborhood, within the city of their former homes, and of the homes of their relatives and friends, and living there, in sight of all, as if married, would be direct manifestation of the consent upon which the contract would rest, and stronger evidence of its existence than any negative reputation, which would necessarily be founded upon mere hearsay. He was dissipated, a frequenter of bawdy houses, and an associate of lewd women, but the mother of the plaintiff appears to have been more and different to him than any other woman. Reputation of his marriage would not be likely to spread to these places, or among these women, and his reputation of being single appears largely from these sources. He made conveyances as single, and had a draught of a will made, which did not mention her or the plaintiff, after she had left him, which goes to show that he then held himself out as single; and administration was applied for on his estate as if he had died single, which goes to show that he was, to those making the application, then reputed to be single. The record of this suit for seduction seems to be admissible as a declaration by her mother which would tend to show family understanding that there was no marriage, but the judgment was not between such parties as to be at all conclusive of anything. This is all reputation, and not direct proof, and is to be considered in connection with other proof of reputation, in arriving at what the extent and pervasiveness of the reputation of marriage or no marriage actually was. When all this is considered, it shows, as found by the circuit court, a reputation too much divided to prove a marriage. It is also too much divided to disprove a marriage otherwise shown, if admissible at all for that purpose. Their acts and conduct to-

wards each other, corroborating and making plain her testimony that there was a marriage in fact, remain. That the registration of their names as, and calling themselves, husband and wife, was necessary for admission to decent places, and that men and women do so for the purpose of living together at such places, is said in argument; but such use of their true names in such and so many prominent places, in the near vicinity of their relatives and acquaintances, and in the city of their own birth and home, does not seem attributable to that mere purpose, and no such custom is proved, or appears to be sufficiently general to be taken judicial notice of. That men live double lives under different names in the same city, and that men and women register at places as husband and wife, under other names, for the purpose of living together there temporarily, may be assumed; and that such holding themselves out would have no tendency to prove that they were husband and wife, but rather the contrary. The difference between using false names and true ones wholly changes the effect of the use as proof. And this purpose of living together temporarily does not explain their traveling together under their true names, as husband and wife, just before the birth of their first child, and burying it as theirs in that relation. Although her first testimony, in view of her last, would be entitled to no weight, alone, and these acts and this conduct might not be sufficient to establish a marriage, against her last, her first furnishes a key to, and is more consistent with, all these, than the last, and helps out and confirms the proof of a marriage in fact. That both treated the bonds of matrimony lightly would not show that they did not, lightly or otherwise, enter into them. The greatest argument against the presumption arising from this holding each other out as husband and wife, and cohabitation, is founded upon the supposition that the cohabitation began meretriciously. But this rests wholly upon her testimony. Take that out, and the first cohabitation shown was that at the Everett House, where they had registered and lived together openly as husband and wife. But her testimony cannot be taken out, for it is in, and must be considered, first and last, and all together, according to its consistency with itself and other proved facts. When so considered, that part which states that they were married while away, just before going to the Everett House, seems more consistent with their going there, and living together as they did, there and elsewhere, long enough to bring forth two children in due course, than her subsequent statement that this was false, and that the marriage was to take place when his mother should die. And to hold that acting as husband with a woman means what it purports, as assuming other capacities does, and legitimatize issue, seems more wholesome than to interpret it away by comparison with false pretenses of others in similar respects, and bastardize issue. Furthermore, as laid down by Sir William Blackstone, any contract made, per verba de praesenti, and in case of cohabitation per verba de futuro, was deemed a valid marriage. 1 Bl. Comm. 465. This is so laid down by Chancellor Kent, (1 Kent, Comm. 87,) and by Professor Greenleaf, (2 Greenl. Ev. § 460.) The circuit court for the

district of South Carolina so charged the jury in Jewell v. Jewell, 1 How. 219; and the supreme court, being equally divided, did not reverse this ruling. The testimony of the mother as to the agreement to marry is not retracted or contradicted, and is corroborated by the same circumstances as her testimony of the marriage. If this be true, and that be law, the plaintiff is legitimate.