OSBORNE et al. v. McDONALD et al.

(Circuit Court, W. D. Washington, N. D. February 21, 1908.)

No. 1,307.

1. BASTARDS—PROPERTY—INHERITANCE FROM BASTARD.

Where a resident of Washington whose parents were not shown to have been married died in 1881, his property descended, according to Code Wash. 1881, § 3306, providing that, if any illegitimate child die intestate without lawful issue, his estate shall descend to his mother, or, in case of her decease, to her heirs.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bastards, §§ 257–262.]

2. SAME—PRESUMPTIONS.

On an issue of heirship, there is no presumption that the alleged heirs are the legitimate descendants of the ancestor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bastards, §§ 4, 5.]

3. MARRIAGE—PROOF—EVIDENCE.

A bare preponderance of evidence is not sufficient to establish the fact of marriage, where there are only meager scraps of testimony tending to prove the marriage consisting of mere uncontradicted surmises and vague rumors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, § 79.]

4. SAME.

While the law does not create a presumption of marriage of a particular couple, yet, when it is shown that they lived together as husband and wife, acknowledged themselves to be such, and they were so reputed among their relatives and friends, a natural presumption consistent only with a lawful marriage and good morals becomes a legal presumption that the parties were married, though such presumption will not be raised by a mere proof of cohabitation, nor from reputation without proof of cohabitation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, §§ 58–69.]

5. SAME—DECLARATIONS.

> On an issue of heirship, evidence of declarations made by deceased members of the family that O.'s father contracted a second marriage was incompetent to prove that O.'s mother ever became the second wife of his father; she being in no manner identified.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, § 75.]

6. SAME.

> On an issue of heirship, evidence *held* insufficient to establish that O.'s parents were married so as to entitle complainants to inherit from O. in the paternal line.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, §§ 79-89.]

In Equity. Suit against trustees appointed by the will of James Osborne, deceased, to recover his estate, on the alleged grounds that the complainants are his legal heirs, and that the attempted disposition of the estate by the will contravenes the rule against the creation of estates in perpetuity and is unlawful. Hearing on the merits. Bill dismissed for failure of proof to establish the right of the complainants as heirs of the deceased to contest the will.

Jenner & Williams, for complainants.

Chas. F. Munday and Scott Calhoun, for defendants.

HANFORD, District Judge. James Osborne died testate at Seattle, and his will was admitted to probate in the year 1881. This suit by alleged heirs, attacking the will, was commenced in the year 1905. The value of the estate is large, the complainants are numerous, and their respective places of residence are in so many states that it was found necessary to dismiss some of them out of the case, for the reason that their presence as parties would defeat the jurisdiction of this court; the only ground for federal jurisdiction being diversity of citizenship of the parties. The will ignores all relatives and heirs, and devotes all the residue of the estate remaining after bequests to personal friends, not heirs, to the erection of an edifice for a public hall on property owned by the city of Seattle, to conform to plans to be approved by the trustees named in the will or their successors, and a committee representing the city government on which there should be an inscription, which presumably the vanity of the testator caused him to contemplate that it would perpetuate the memory of his name and virtues. In the consideration of the foregoing facts and dates, the mind is naturally and forcibly arrested by the query:—why, if the complainants have a meritorious claim, did they slumber upon their rights for a period of nearly 24 years? Their bill of complaint anticipates and attempts to answer this query by averments to the effect that until recently the complainants did not know anything concerning the death of James Osborne, or his will, or the existence of an estate, and most of them did not know that any such person as James Osborne ever existed. This is true, and for the purpose of this decision it will be assumed that the ignorance pleaded excuses the apparent laches, but it creates in the mind a natural involuntary prejudice, because it is so improbable that all the members of a family so numerous, and connected by various ties, with so many people in so many places, should remain thus ignorant

of the life and death of James Osborne, if, in fact, he was related to the family by inheritable blood. This improbability might be overcome if James Osborne had left any record of his life, or had been communicative with respect to his early life and surroundings, so that of those who knew him witnesses might be found able to prove from information furnished by him the important facts with respect to his parentage, but only two of those who knew him after he came to Seattle have testified and they are able to give only a few meager scraps of information to the effect that he came from Morrisania, N. Y.; that he had some half-brothers; that his mother died; that he went as a sailor to Havre, France; that he returned to Morrisania; that during the period of his absence his father had died; that he again went to sea on a voyage around Cape Horn to San Francisco, and after a time came to Port Gamble, and then to Seattle; and that he had no use for his relatives and they had no use for him. Another way of overcoming the improbabilities of the case would be by the production of correspondence or written communications between the testator and his relatives: but, if any letter was ever written by him to any person, relative, or friend, it has not been produced. In view of the circumstances and without proof of the character suggested, the uncertainty of any conclusion or inference which may be drawn from the testimony is so great that the due administration of justice requires the production of other convincing evidence of all the facts essential to establish the claims of the complainants that they are legal heirs of the testator. To avoid the necessity of a complete analysis of all the evidence, it will be assumed for the purpose of this decision that the following propositions set forth in the brief of the solicitors for the complainants are true:

"(1) That said James Osborne, deceased, was born in the county of Westchester, N. Y., about the year 1835.

"(2) That said James Osborne, deceased, lived at Morrisania, or the Bronx, Westchester county, N. Y., until he was about the age of 17 years, at which time he left his home and went to sea, along about the year 1852 or 1853, and this first voyage was foreign, to wit, to Havre, France.

"(3) That after an absence of about four years said James Osborne returned to Morrisania, his former home, and found that his father had died during his absence, and that, after remaining there a short time, he again left his said home and went to sea, and never returned to the state of New York after that time.

"(4) That the said James Osborne about the year 1860 left the state of California from the port of San Francisco, and went by water to Puget Sound, landing at Port Gamble about that year, and that he resided thereafter in the territory of Washington until the time of his death.

"(5) Subsequent to his last departure from Morrisania said James Osborne at no time communicated with his relatives in any manner, nor with any other person, so far as known, in the state of New York, with the exception of one letter written from California to William Cauldwell.

"(6) That said James Osborne left relatives in Westchester county, N. Y., upon his departure therefrom.

"(7) That said James Osborne left relatives, to wit, half-brothers and a half-sister in Westchester county, N. Y., at the time of his last departure therefrom.

"(8) That said James Osborne was the half-brother of Louis K. Osborne.

"(9) That said Louis K. Osborne was the father and grandfather of certain of the complainants as set forth in the amended bill of complaint, and that he was the brother of Caroline Doty, Horace Osborne, Solomon Enos

Osborne, and Clarke Osborne, the mother and fathers and ancestors of the other complainants named in said amended bill of complaint.

"(10) That the father of James Osborne, deceased, was one Abram or Abraham Osborne, who was one of the veterans of the War of 1812. ⁂ ⁂ ⁂

"(11) That said Abraham Osborne, father of said James Osborne, deceased, ancestor of these complainants, abandoned his first family, namely, Louis K. Osborne, Horace Osborne, Caroline Osborne, Solomon Enos Osborne, and Clarke Osborne, ⁂ ⁂ ⁂ and that his said last-named children became estranged from him and were taken to North Salem, a place 40 or 50 miles north of Morrisania, Westchester county, N. Y., by a brother of said Abraham Osborne, to wit, Northrup Osborne, who raised said sons until they arrived at maturity.

"(12) That the children of said Abraham Osborne by his first wife considered their father as somewhat disreputable in character, and for that reason seldom, if ever, talked with their children about him.

"(13) That the mother of said James Osborne died some years prior to his first leaving home, about the year 1852, and many years prior to the death of his father, Abraham Osborne."

The lines of the tenth and eleventh propositions which are omitted from the above quotation assume as facts that Abraham Osborne contracted a second marriage, and that James Osborne was legitimate issue of that marriage. These facts essential to make a complete case for the complainants are not to be presumed, but must be established by convincing proof, before the complainants can be heard to assert their claims as owners of the estate in opposition to the trustees in possession by virtue of the testamentary disposition made of it by the man for whom they, their parents, and grandparents cared not during his lifetime. If the parents of James Osborne were not lawfully married, the descendants of his father are not his heirs. This is so for the reason that his property descended according to the laws of Washington Territory in force at the time, and by section 3306 of the Code of 1881 it is provided that:

"If any illegitimate child shall die intestate without lawful issue, his estate shall descend to his mother, or in case of her decease, to her heirs at law."

This decision will not rest upon any presumption that James Osborne was not a legitimate son of his father, but on the ground of failure of proof, because there is no presumption that the complainants are his legal heirs, nor of any material fact essential to establish their rights as heirs. In the case of Blackburn v. Crawford, 3 Wall. 186, 18 L. Ed. 186, the Supreme Court assigned as one of the grounds for reversing a judgment that it was error to charge the jury that "the presumption of law was in favor of the legitimacy of children," and in that connection the court said:

"Under such circumstances, the law makes no presumption. The question to be determined was one of fact, and not of law."

In Arnold v. Chesebrough (C. C.) 46 Fed. 700, Judge Lacombe said:

"Whoever asserts a marriage as a basis of a claim at law or equity must satisfy the court, upon the whole case, by a fair preponderance of proof, not necessarily where and when such contract was made, but that at some time and place it was made."

That decision was affirmed on appeal. 58 Fed. 833, 7 C. C. A. 508.

I hold, further, that a bare preponderance of evidence is not sufficient to establish the fact of a marriage, where only meager scraps of testimony, tending to prove only surmises or vague rumors or traditions, are introduced on one side and left uncontradicted. There must be competent evidence sufficient to create a belief, if uncontradicted, that there was a marriage. In other words, until a prima facie case has been made, a defendant cannot be put upon his defense, and required to disprove an assertion not supported by evidence sufficient to justify a reasonable belief. The law is extremely liberal with respect to the mode of proving the fact of a marriage, and every variety of evidence direct and circumstantial is admissible in cases of difficulty. 19 Am. & Eng. Enc. of Law (2d Ed.) p. 1197. Whilst it is true, as above stated, that the law does not of itself create a presumption of marriage of a particular couple, a natural presumption arising from proved facts, consistent only with a lawful marriage and good morals, becomes a legal presumption. In general, where parties have "lived together as man and wife, acknowledging themselves to be such, and reputed to be such among their relatives and friends, the law will presume, in the absence of other evidence, that they have been legally married"; and a presumption based upon that state of facts is one of the strongest known to the law, but, in the absence of other evidence, marriage will not be presumed from mere cohabitation, nor from reputation without proof of cohabitation. 19 Am. & En. Enc. of Law (2d Ed.) pp. 1204, 1205.

After a painstaking study of all the evidence submitted in this case, I am obliged to say that I find not a scintilla of evidence tending to prove that the parents of James Osborne were married. His mother is not identified. No witness who has testified pretends to have known her, nor to ever have seen her, nor to have heard any other person make any statement or declaration concerning her who pretended to have known her. Her name cannot be discovered from all the evidence in this case, and it cannot be discovered from all the evidence when, if at any time, or where, if at any place, she cohabited with Abraham Osborne, nor that she was known at all to any member of the Osborne family. In their argument the solicitors for the complainants seem to rely upon testimony tending to prove declarations made by deceased members of the family which if shown to have been based upon actual knowledge might be competent to prove that Abraham Osborne contracted a second marriage, but all such declarations are incompetent to prove that the mother of James Osborne ever became the second wife of his father because she is not in any way identified. The only one of the declarations which refers to the person supposed to have become the second wife of Abraham Osborne is found in the deposition of Emma C. Osborne, a daughter of Clarke H. Osborne, one of the sons of Abraham Osborne. Her statement refers to her father, and is as follows:

"He told me his stepmother sent for him when dying, but he would not go."

According to the understanding of the witness, this occurrence was when her father was very young. He was born in the year 1819.

James Osborne was born in the year 1835, and, unless his mother died during his infancy, it is not probable that she is the stepmother who is supposed to have died at a time when the man who made the declaration was very young. It is unnecessary to make further comments on the testimony. It is enough to say that, considered in its entirety and in detail, it dispels rather than supports any reasonable inference that the parents of James Osborne were actually married, or that they cohabited together as husband and wife, and were reputed to be married.

For their failure to prove that they are the legal heirs of James Osborne, I direct that a decree be entered dismissing the suit, with costs.